UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| In re GE ERISA LITIGATION | ) | Master File No. 1:17-cv-12123-DJC |
|---|---|---|
| | ) | |
| | ) | CLASS ACTION |
| This Document Relates To: | ) | |
| | ) | CONSOLIDATED AMENDED |
| ALL ACTIONS. | ) | COMPLAINT FOR BREACH OF |
| | ) | FIDUCIARY DUTY AND PROHIBITED |
| | | TRANSACTIONS UNDER THE |
| | | EMPLOYEE RETIREMENT INCOME |
| | | SECURITY ACT |

Plaintiffs Maria LaTorre, Robyn Berger, Brian Sullivan, Frank Magliocca, and Melinda Stubblefield (collectively "Plaintiffs") bring this action by and through their undersigned attorneys based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, *inter alia*, a review of U.S. Department of Labor ("DOL") and U.S. Securities and Exchange Commission ("SEC") filings by General Electric Company ("GE" or the "Company"), as well as defined contribution plan documents, media reports about the Company, and an analysis of available fund and investment information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    Plaintiffs bring this action individually, on behalf of a class of all participants in GE's 401(k) Plan, a/k/a the GE Retirement Savings Plan, and its predecessor the GE Savings and Security Program (together the "Plan") between October 30, 2011 to the date of Judgment (the "Class Period"), and on behalf of the Plan, for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, *et seq*. ("ERISA"), against the Defendants, as defined below.  As alleged herein, Defendants have breached their fiduciary duties of prudence and loyalty with respect to the Plan, and entered into prohibited transactions in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries.

2.    To safeguard against the financial incentives for disloyalty and imprudence in defined contribution plans, ERISA imposes strict duties of loyalty and prudence upon plan fiduciaries.  ERISA §404(a) (1), 29 U.S.C. §1104(a) (1).  These fiduciary duties are "the highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citation omitted).

When selecting investments for a retirement plan, fiduciaries must act "solely in the interest of the participants and beneficiaries," which requires them to perform with undivided loyalty, act prudently, and defray reasonable plan expenses.  29 U.S.C. §1104(a)(1).

3.     Defendants did not consider or act in the best interest of the Plan and its participants throughout the Class Period.  Instead, Defendants put their interests before Plan participants by treating the Plan as an opportunity to promote and generate fees for the proprietary mutual fund business of GE and its affiliates.  Defendants caused all of the Plan's actively managed funds to be managed and sponsored by GE's wholly owned subsidiary, GE Asset Management Incorporated, "GE Asset Management" and its successor entity, SSGA Funds Management, Inc. ("SSGA") even though those funds were obviously imprudent and would be imprudent to any other fiduciary under the circumstances.

4.     Defendants sought to prop up GE Asset Management's mutual fund business after the proprietary mutual funds experienced large outflows by non-GE plan participants. Defendants accomplished this by loading the Plan with GE proprietary mutual funds, despite the fact that Plan participants would have been better served by investment options managed by unaffiliated companies that included options to invest in less expensive and better performing mutual funds.  Defendants' self-dealing, which allowed them to reap millions of dollars in fee income from Plan participants, violated their obligations under ERISA.

5.     During the Class Period, Plan participants were offered the following proprietary mutual funds: GE Institutional Strategic Investment Fund ("Strategic Investment Fund"), GE Institutional Small Cap Equity Fund ("Small Cap Equity Fund"), GE Institutional International Equity Fund ("International Equity Fund"), GE RSP Income Fund ("Income Fund") and GE RSP

U.S. Equity Fund ("U.S. Equity Fund") (collectively the "GE Funds") that were corrupted by poor performance, high fees or both.

6.     The Plan fiduciaries' decision to load the Plan with poorly performing, expensive, proprietary mutual fund options enabled GE to earn more than $175 million in fees from 2010 through 2016 in violation of their duties of prudence and loyalty under ERISA and costing Plan participants tens of millions of dollars in lost retirement income – a harm that has only compounded over time.

7.     In addition to enabling GE to earn a huge amount of fees, Defendants' self-serving conduct enabled GE to build up its asset management business, and enhance its value on the backs of Plan participants.  In fact, since 2013, at least 65% of the GE Funds Plan assets have consisted of Plan participant investments.  Defendants were, in effect, "seeding" the GE Funds to generate fees, which bolstered GE Asset Management's planned sale to State Street Corporation ("State Street") (described below). After building the profits of the GE Funds through captive Plan participant investments, GE sold GE Asset Management to State Street in July 2016 for $485 million generating approximately $400 million in income for the Company.  According to Department of Labor Advisory Opinion 98-06-A, such self-serving conduct is prohibited, and a "plan fiduciary would be liable for any loss resulting from such breach of fiduciary responsibility."

8.     To remedy these fiduciary breaches and prohibited transactions, Plaintiffs, individually and as representatives of a Class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan to recover all losses resulting from the Plan fiduciaries' breaches of fiduciary duty and other ERISA violations and restore to the Plan any profits made by the fiduciaries or the persons and/or entities who knowingly participated in the fiduciaries'

imprudent and disloyal use of the Plan's assets.  In addition, Plaintiffs seek such other equitable or remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

11.    Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is administered in Boston, Massachusetts, many violations of ERISA took place in this District, and/or multiple defendants may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because multiple defendants reside and/or do business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

**Plaintiffs**

12.    Plaintiff Maria LaTorre was a participant in the Plan during the Class Period.  As a participant, plaintiff LaTorre invested in various funds offered within the Plan, including the Strategic Investment Fund, the Small Cap Equity Fund, the International Equity Fund, the Income Fund and the U.S. Equity Fund, among others.  Plaintiff LaTorre has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore,

Defendants have been unjustly enriched from the various fees and expenses generated as a result of plaintiff LaTorre's Plan investments.

13.    Plaintiff Robyn Berger was a participant in the Plan during the Class Period.  As a participant, plaintiff Berger invested in various funds offered within the Plan, including the Strategic Investment Fund, the Small Cap Equity Fund, the International Equity Fund and the U.S. Equity Fund, among others.  Plaintiff Berger has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, Defendants have been unjustly enriched from the various fees and expenses generated as a result of plaintiff Berger's Plan investments.

14.    Plaintiff Brian Sullivan was a participant in the Plan during the Class Period.  As a participant, plaintiff Sullivan invested in various funds within the Plan, including the Strategic Investment Fund, the Small Cap Equity Fund, the International Equity Fund, the Income Fund and the U.S. Equity Fund, among others.  Plaintiff Sullivan has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, Defendants have been unjustly enriched from the various fees and expenses generated as a result of plaintiff Sullivan's Plan investments.

15.    Plaintiff Frank Magliocca was a participant in the Plan during the Class Period.  As a participant, plaintiff Magliocca invested in various funds within the Plan, including the Strategic Investment Fund, the International Equity Fund, the Income Fund, and the U.S. Equity Fund. Plaintiff Magliocca has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, Defendants have been unjustly enriched from the various fees and expenses generated as a result of plaintiff Magliocca's Plan investments.

16.     Plaintiff Melinda Stubblefield was a participant in the Plan during the Class Period. As a participant, plaintiff Stubblefield invested in various funds within the Plan, including the Small Cap Equity Fund, the International Equity Fund, the Income Fund and the U.S. Equity Fund, among others.  Plaintiff Stubblefield has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, Defendants have been unjustly enriched from the various fees and expenses generated as a result of plaintiff Stubblefield's Plan investments.

**Defendants**

**The Company**

17.     Defendant GE is a New York corporation headquartered in Boston, Massachusetts that operates a global digital industrial company.  Until July 1, 2016, GE operated a for-profit investment management business through its wholly owned subsidiary, GE Asset Management, which served as the investment manager for the investment options in the Plan detailed herein. GE is the sponsor of the Plan within the meaning of ERISA §3(16)(B), 29 U.S.C. §1002(16)(B).

18.     According to the Plan Document Section XI.A.2., GE is "the Administrator of the Plan."   Additionally, the Plan Document Section XI.A.1. provides that the operation and administration of the Plan is vested in GE except for powers or duties regarding the operation and administration of the Plan that have been expressly allocated to other named fiduciaries.

19.     According to the Plan's Trust Agreement, the Company exercises discretionary authority by requiring certain GE investment options to be offered by the Plan and by providing the criteria for Plan investment options.  Therefore, the Company is a Plan fiduciary as it has exercised or possessed: (i) discretionary authority and control over Plan management; (ii) authority or controls respecting the management or disposition of Plan assets; and/or (iii) exercised or possessed discretionary authority and control with respect to the appointment or

- 6 -

termination of other Plan fiduciaries.  The Company is also a Plan fiduciary because it has rendered investment advice with regard to the Plan, for a fee or other compensation, direct or indirect, with respect to Plan investments.

**GE Asset Management**

20.  Defendant GE Asset Management was a wholly owned subsidiary of GE.  From October 2011 through July 2016, GE Asset Management managed and sponsored the GE Funds. Its assets and investment professionals were acquired by State Street in July 2016 for $485 million.

21.  Defendant GE Asset Management has been the investment manager of the Plan, as appointed by the Plan administrator, GE, and received compensation in connection with mutual fund investments in the Plan at all relevant times herein.  Until its sale to State Street, GE Asset Management was a party in interest to the Plan, as defined in ERISA §3(14), 29 U.S.C. §1002(14), because it was an employer of employees covered by the Plan and served as an investment manager to the Plan.

**The Investment Committee Defendants**

22.  Defendant Benefit Plans Investment Committee (the "Committee" or "BPIC")[1] is a named fiduciary of the Plan and is charged with primary fiduciary responsibility for investment oversight of the Plan.  According to the Declaration of Scott Alan Silberstein, Executive Counsel for the Company (the "Silberstein Declaration"), BPIC's functions and responsibilities include:

- Reviewing periodic reports on the performance of investment options;

---

[1]  Based on the representation of defense counsel, the "Committee," as it is referred to and defined in the Plan Document is the "Benefit Plan Investment Committee" as it is described in the Silberstein Declaration.

- Evaluating investment performance of Plan investment options;

- Considering the addition of any new investment options or the removal of any investment options from the Plan; and

- Appointing members of the GEAM Committee, described below.

23.    Additionally, according to Section XIII.B.1. of the Plan Document, BPIC appoints individuals to act as "Fund Trustees" to manage and control the assets of the Income Fund and U.S. Equity Fund.

24.    The "Investment Committee Defendants" consist of the BPIC and its individual members.[2]  At all relevant times herein, the members of the BPIC (as well as the BPIC itself) were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) as a result of their membership on the BPIC and because they each exercised or possessed discretionary authority or discretionary control respecting management of the Plan and/or exercised or possessed authority or control respecting management or distribution of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**Asset Management Defendants**

25.    Defendant, the "GEAM Committee," has served as Trustee of the Plan pursuant to the Trust Agreement and was a named fiduciary of the Plan at all relevant times herein. According to the Silberstein Declaration, the GEAM Committee's fiduciary responsibilities include reviewing Plan investment options and making recommendations to the BPIC about the removal, suspension, or lack thereof of Plan investment options.

---

[2]    Plaintiffs' counsel has requested that Defendants provide the identities of the individual members of the BPIC and their tenures, but Defendants have refused to do so.

26.   Defendant Scott Silberstein ("Silberstein") has served as Executive Counsel, Investment Oversight, for "GE Benefit Plans" and during the Class Period was a GEAM Committee Member and Plan Trustee.

27.   The "Asset Management Defendants" consist of the GEAM Committee and its members.  Pursuant to the Trust Agreement, the GEAM Committee and its members are the Plan Trustees.

28.   According to Annual Shareholder Reports of the GE Funds filed with the SEC during the Class Period, the following Defendants were Plan Trustees:

(a)   Defendant Dmitri Stockton, former GE Asset Management President and Chief Executive Officer;

(b)   Defendant George A. Bicher, GE Asset Management Chief Investment Officer, "Emerging Markets Equities";

(c)   Defendant Paul Colonna, GE Asset Management President and Chief Investment Officer, "Public Investments";

(d)   Defendant Michael J. Cosgrove, GE Asset Management President of "Mutual Funds and Global Investment Programs";

(e)   Defendant Greg Hartch, GE Asset Management Chief Risk Officer;

(f)   Defendant Jessica Holscott, GE Asset Management Executive Vice President;

(g)   Defendant Jeanne M. LaPorta, GE Asset Management Senior Vice President;

(h)   Defendant Ralph Richard Layman, GE Asset Management Executive Vice President;

(i)       Defendant Silberstein;

(j)       Defendant Matthew J. Simpson, GE Asset Management Executive Vice President;

(k)       Defendant Don W. Torey, GE Asset Management President and Chief Financial Officer, "Alternative Investments";

(l)       Defendant David Wiederecht, GE Asset Management President and Chief Investment Officer, "Investment Solutions"; and

(m)      Defendant Matthew Zakrzewski; Executive Vice President and Chief Financial Officer of GE Asset Management.

29.   At all relevant times herein, the Asset Management Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) because they each exercised or possessed discretionary authority or discretionary control respecting management of the Plan and/or exercised or possessed authority or control respecting management or distribution of the Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**Fund Trustee Defendants**

30.   The "Fund Trustee Defendants" are GEAM executive officers that, according to Section XIII.B.1. and Section XX of the Plan Document, are named fiduciaries appointed by the BPIC that had exclusive authority to manage and control the assets of the Income Fund and U.S. Equity Fund.

31.   According to the Annual Shareholder Reports of the Income Fund and U.S. Equity Fund filed with the SEC during the Class Period, the following Defendants were Fund Trustees:

(a)       Defendant Dmitri Stockton, former GE Asset Management President and Chief Executive Officer;

(b)      Defendant George A. Bicher, GE Asset Management Chief Investment Officer, "Emerging Markets Equities";

(c)      Defendant JoonWon Choe, GE Asset Management Senior Vice President;

(d)      Defendant Paul Colonna, GE Asset Management Chief Investment Officer, "Public Investments";

(e)      Defendant Greg Hartch, GE Asset Management Chief Risk Officer;

(f)      Defendant Jessica Holscott, GE Asset Management Executive Vice President;

(g)      Defendant Arthur A. Jensen, GE Asset Management Treasurer;

(h)      Defendant Jeanne M. LaPorta, GE Asset Management Senior Vice President;

(i)      Defendant Ralph Richard Layman, GE Asset Management Executive Vice President;

(j)      Defendant Matthew J. Simpson, GE Asset Management Executive Vice President;

(k)      Defendant Don W. Torey, GE Asset Management President and Chief Financial Officer, "Alternative Investments";

(l)      Defendant David Wiederecht, GE Asset Management President and Chief Investment Officer, "Investment Solutions"; and

(m)      Defendant Matthew Zakrzewski; Executive Vice President and Chief Financial Officer of GE Asset Management.

32.   At all relevant times herein, the Defendant Fund Trustees were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) because they each exercised or possessed authority or control respecting management or distribution of the Plan assets.

**Pension Board Defendants**

33.   Defendant GE Pension Board (the "Pension Board" or "GEPB") is a named fiduciary of the Plan.  According to Section XXI of the Plan Document, the Pension Board means the Pension Board as defined in the GE Pension Plan (*i.e.*, the GE defined benefit plan). According to excerpts of Section XX of the GE Pension Plan provided by Defendants, the control and management of the operation and administration of the Plan shall be vested in a Pension Board unless the Plan or Trust provides otherwise.

34.   The "Pension Board Defendants" consist of the GEPB and its individual members. According to the excerpts of Section XX of the GE Pension Plan provided by Defendants, the Pension Board consists of a chairperson and four or more other members appointed annually by the Board of Directors of GE to hold office at the pleasure of the Board of Directors.[3]

35.   According to the Section VI.F.6. of the Plan Document, the GEPB has the following express powers, duties, obligations, and fiduciary responsibilities with respect to the management and control of the operation and administration of the Plan: "establish such written procedures as are necessary to effectuate administration of the Plan."

36.   At all relevant times herein, the Pension Board and the Pension Board Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), as a result of their membership on the Pension Board and because they each exercised or possessed discretionary authority or discretionary control respecting management of the Plan, and/or had

---

[3]   Plaintiffs' counsel has requested that Defendants provide the identities of the individual members of the GEPB and their tenures, but Defendants have refused to do so.

discretionary authority or discretionary responsibility in the administration of the Plan with respect to establishing and enforcing rules and procedures of the Plan.

**Board Defendants**

37.    The "Board Defendants" consist of the GE Board of Directors (the "Board") and its individual members named below.  According to excerpts of Section XVII of the GE Pension Plan provided by Defendants, the Board is charged with establishing the Committee and appointing Committee members who serve at its pleasure.  Additionally, according to excerpts of Section XX of the GE Pension Plan provided by Defendants, the Board was responsible for annually appointing GEPB members, consisting of a chairperson and four or more other members that hold office at the pleasure of the Board.

38.    As a result of the powers granted by the Plan Document, the Board Defendants were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §1002(21)(A), because each exercised or possessed discretionary authority to appoint, monitor and remove Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

(a)    Defendant John L. Flannery is the current Chairman of the Board and has served as a member of the Board since August 1, 2017;

(b)    Defendant Jeffrey Immelt was Chairman of the Board from 2001 to August 2017;

(c)    Defendant Sebastien M. Bazin has served as a member of the Board since 2016;

(d)    Defendant W. Geoffrey Beattie has served as a member of the Board since 2009;

(e)     Defendant John J. Brennan has served as a member of the Board since 2012;

(f)     Defendant Francisco D'Souza has served as a member of the Board since 2013;

(g)     Defendant Marjin E. Dekkers has served as a member of the Board since 2012;

(h)     Defendant Edward Garden has served as a member of the Board since October 2017;

(i)     Defendant Peter B. Henry has served as a member of the Board since 2016;

(j)     Defendant Dr. Susan J. Hockfield has served as a member of the Board since 2006;

(k)     Defendant Andrea Jung has served as a member of the Board since 1998;

(l)     Defendant Robert W. Lane has served as a member of the Board from 2005 to October 2017;

(m)     Defendant Risa Lavisso-Mourey has served as a member of the Board since March 2017;

(n)     Defendant Rochelle B. Lazarus has served as a member of the Board since 2000;

(o)     Defendant Lowell C. McAdam has served as a member of the Board from 2016 to December 2017;

(p)     Defendant Steven M. Mollenkopf has served as a member of the Board since 2016;

- 14 -

(q)     Defendant James J. Mulva has served as a member of the Board since 2008;

(r)     Defendant James E. Rohr has served as a member of the Board since 2013;

(s)     Defendant Mary L Schapiro has served as a member of the Board since 2013; and

(t)     Defendant James S. Tisch has served as a member of the Board since 2010.

**The Plan**

39.   Nominal Defendant, the GE Retirement Savings Plan formerly known as the GE Savings and Security Program, (*i.e.*, the Plan), is and at all relevant times has been an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A), and a "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).  The Plan is named as a nominal defendant pursuant to Fed. R. Civ. P. 19 to ensure that complete relief can be granted as to claims brought on behalf of the Plan.

**"Doe" Defendants**

40.   To the extent that the identities of members of the BPIC and/or GEPB become known and/or there are additional officers and employees of GE or GE Asset Management, or other entities or persons who were fiduciaries of the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "Doe" defendants include other individuals and entities who were fiduciaries of the Plan within

the meaning of ERISA §§3(21) and/or 402(a)(1) during the Class Period and are personally liable under ERISA §409(a).

### DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

**Duty of Loyalty**

41.   ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.  According to the DOL, the "primary responsibility of fiduciaries is to run the plan *solely* in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits and paying plan expenses" (emphasis added).  In addition, ERISA fiduciaries "must avoid conflicts of interest" and "may not engage in transactions on behalf of the plan that benefit parties related to the plan, such as other fiduciaries, services providers or the plan sponsor."  Thus, the duty of loyalty prohibits fiduciaries from acting in service of their own interests or those of a third party to the detriment of plan participants, including by charging or allowing to be charged excessive fees in plan investment options.

42.   ERISA §404(a)(1) states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

> (A)   for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan.

29 U.S.C. §1104(a)(1).

43.   The duty of loyalty requires fiduciaries to act with an "'eye single'" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "'Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the

interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons.'" *Id.* at 224.

44.    Where fiduciaries have conflicting interests that raise questions regarding their loyalty, the fiduciaries "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Kanawi v. Bechtel*, No. 09-16253 (9th Cir. 2009) (DOL Amicus Brief).

**Duty of Prudence**

45.    ERISA "'imposes a "prudent person" standard by which to measure fiduciaries' investment decisions and disposition of assets.'" *Fifth Third Bancorp v. Dudenhoeffer*, __ U.S. __, 134 S. Ct. 2459, 2467 (2014) (citation omitted).   This means that ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use."   29 U.S.C. §1104(a)(1)(B).    As the Uniform Prudent Investor Act ("UPIA") observes: "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."  UPIA §7 cmt.

46.    In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones," which exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, __ U.S. __, 135 S. Ct. 1823, 1828 (2015).  If an investment is imprudent, the plan fiduciary "'must dispose of it within a reasonable time.'"   *Id.* (citation omitted). Fiduciaries therefore may be held liable for either assembling an imprudent menu of investment options or for failing to monitor a plan's investment options to ensure that each option remains prudent.

47.    The general duties of loyalty and prudence imposed by ERISA §404 are supplemented by certain transactions that are expressly prohibited by ERISA §406, and are considered "per se" violations because they entail a high potential for abuse.

## SUBSTANTIVE ALLEGATIONS

**The Plan**

48.    The written instrument, within the meaning of ERISA §402, 29 U.S.C. §1102, by which the Plan is maintained is the GE Retirement Savings Plan (the "Plan Document"), as amended as of July 1, 2015.[4]

49.    Effective January 1, 2014, the Plan was amended to change its name from the GE Savings and Security Program to the GE Retirement Savings Plan. The Plan provides retirement income for GE's current and former employees and those of participating affiliates of GE. The retirement income available for Plan participants depends on the amount invested by Plan participants, the amount the Company contributes on behalf of its employees, and the performance of selected investment options less the investments' fees and expenses.

50.    Throughout the Class Period, the Plan was one of the largest employee defined-contribution retirement plans in the United States, with nearly a quarter of a million Plan participants. Between 2011 and 2016, total assets for the Plan ranged from about $19.5 billion to over $29 billion.

---

[4]    In response to Plaintiff LaTorre's November 14, 2017 ERISA §104(b)(4) request, the Plan Administrator provided Plaintiffs with certain documents and information regarding the Plan including the Plan Document. The Plan Administrator did not provide Plaintiffs with a copy of the prior Plan Document, but, Plaintiffs are not aware of any material changes to the Plan Document prior to July 1, 2015 based upon the documents and information provided.

**The Investment Options in the Plan**

51.   Eligible employees of the Company and participating affiliates may participate in the Plan by investing up to 30% of their eligible earnings in one of several investment options, including the GE Funds.

52.   Each of these funds was the exclusive investment option in its respective category of actively managed investments.   For example, if a Plan participant wanted to invest in an actively managed large cap strategy, the U.S. Equity Fund was the only available option.   In addition to the GE Funds, the Plan's investment options consisted of the GE Stock Fund, six collective trust index funds, a Target Date Fund and a Money Market Fund.   According to the Target Date Funds Profile, the Target Date Funds exclusively invested in the collective trusts and the Money Market Fund already offered by the Plan.   Thus, the Plan fiduciaries effectively limited participants' investment choices to only GE Stock, the Money Market Fund, six collective trust index funds and the GE Funds.   If a Plan participant did not want to invest in GE Stock, the Money Market Fund, or an index fund directly or indirectly, the only other Plan investment option were the GE Funds.

53.   Rather than fulfilling their fiduciary duties by engaging in a disinterested process designed to serve the best interests of Plan participants, the Plan fiduciaries structured the Plan to maximize their own profits so that if a participant wanted to invest in actively managed mutual funds they were forced to select the GE Funds which were all proprietary funds with subpar performance and/or had excessively high fees (often with significantly greater risk than other comparable funds in their investment category) that benefitted GE and GE Asset Management to the detriment of Plan participants.   The Plan fiduciaries could have, but failed to, include funds with comparable or better performance from unaffiliated fund managers.   Furthermore, the Plan

fiduciaries also breached their fiduciary duties by failing to remove imprudent investment options from the Plan.

54.  Plan participants invested billions of dollars through the Plan into the GE Funds. Indeed, roughly a third of Plan assets constituted investments in the GE Funds throughout the Class Period, as detailed in the following chart (as of December 31st of each calendar year):

| Plan Year | Overall Plan Assets | Plan Assets in GE Funds (% Total) |
|---|---|---|
| 2016 | $29.593B | $8.23B (28%) |
| 2015 | $28.717B | $8.202B (29%) |
| 2014 | $27.099B | $8.847B (33%) |
| 2013 | $27.464B | $8.711B (32%) |
| 2012 | $22.309B | $7.475B (34%) |
| 2011 | $19.598B | $6.677B (34%) |

55.  As of December 31, 2015, the Plan had approximately $28.7 billion in overall assets, $8.2 billion of which was invested in the GE Funds and $11 billion of which was invested in GE common stock.  As a result, *over 66%* of the Plan was invested in GE-affiliated investment options.

**Fees Substantially Impact Return on Investment**

56.  In defined-contribution plans, such as the Plan, fees paid by a plan participant reduce the amount available for investment and negatively impact the total return on the participants' investments.  Because retirement savings in defined-contribution plans grow and compound over the course of an employee-participant's career excessive fees can dramatically reduce the amount of funds available for a participant by the time of retirement.  Over time, due to the power of compounding, even apparently minor differences in investment performance and fees can result in drastic differences in the funds available at retirement for ERISA beneficiaries.

57.  The following example from the DOL illustrates how even apparently minor differences can greatly impact a participant's retirement account over time:

Assume that you are an employee with 35 years until retirement and a current 401(k) account balance of $25,000.  If returns on investments in your account over the next 35 years average 7 percent and fees and expenses reduce your average returns by 0.5 percent, your account balance will grow to $227,000 at retirement, even if there are no further contributions to your account.  If fees and expenses are 1.5 percent, however, your account balance will grow to only $163,000.  The 1 percent difference in fees and expenses would reduce your account balance at retirement by 28 percent.

58.   As another example, the SEC's Office of Investor Education and Advocacy, emphasized in the graph reproduced below that even though investment fees may seem small they can have a major impact on investment returns over time.



**Large Retirement Plans Are Able to Lower the Cost of Investment Options**

59.   The size of a retirement plan and the way investment vehicles are structured can impact the amount of fees charged to plan participants.  Generally, participants in 401(k) plans should be able to gain access to lower fees than comparable products outside of 401(k) plans.  By

pooling their money in a 401(k) plan, individual participants are able to increase the amount of money invested in a particular fund, diversify their investments, benefit from economies of scale, and lower their transaction costs.   According to a 2015 study by the Investment Company Institute, 401(k) mutual fund investors pay approximately 23% lower fees than non-401(k) equity mutual funds (the "2015 ICI Report").  This reduction in fees is inversely correlated with the size of the plan: the larger the plan, the lower the total fees.  For example, according to the 2015 ICI Report, plans with more than $1 billion in assets charged on average 75% lower fees than the average fees charged by plans with $1 million to $10 million in assets.

60.   Plans with a large amount of assets can take advantage of lower cost investment vehicles.  A common strategy to reduce fees is to structure investment options as collective trusts or pooled separate accounts.  Collective trusts, which are not available to retail investors and are regulated by the Office of the Comptroller of the Currency rather than the SEC, have simpler disclosure statements, smaller prospectuses and lower advertising and marketing costs.  Similarly, separate accounts, which are available to retirement plans, have lower regulatory oversight and reporting and disclosure requirements.  As a result, these investment structures can charge significantly lower fees than comparable mutual fund investment strategies.  For example, according to a January 2016 report by SSGA, the expense ratios of collective trusts were up to 30% lower than comparable mutual funds.

61.   For the fiscal year ended December 31, 2016, the Plan had more than **$29 billion** in assets, making it one of the largest – and thus one of the most powerful in terms of bargaining position – defined-contribution plans in the United States.  As a result of its immense size, the Plan could have used its significant bargaining power, economies of scale and leverage to achieve fees far less than those available to individual investors or even other ERISA plans with

comparable investment strategies.  Even though the Plan offered a handful of **non**-proprietary, passively managed investment options structured as separate accounts or collective trusts, the actively managed **proprietary** GE Funds were structured as more expensive mutual fund options enabling Defendant GE Asset Management and its parent, Defendant GE, a fiduciary of the Plan, to earn millions of dollars in fees from Plan participants.

**Large Retirement Plans Can Offer Investment Options with Significantly Lower Risk**

62.    In addition to performance and fees, another important characteristic of evaluating a mutual fund investment option for inclusion in a retirement plan is the inherent risk of that fund's investment portfolio.  Although returns and risk should move in tandem – that is, the greater the risk the greater the return on investment, and the lower the risk the lower the return on investment – there are various common financial metrics that can be used to demonstrate that a fund is achieving poorer returns than its benchmarks, while at the same time assuming greater risk than its corresponding benchmarks.  The latter was the case with several of the GE Funds, effectively hitting Plan participants with a triple whammy: worse performance, greater fees, and greater risk than comparable alternatives.

63.    The three financial metrics commonly used by investors to compare the risk of a fund with its category benchmark are the Treynor Ratio, the Sharpe Ratio, and the Sortino Ratio.[5]    The greater the Treynor, Sharpe and Sortino ratios of a fund compared to the

---

[5]    The Treynor Ratio is calculated as follows: (Average Return of a Portfolio - Average Return of the Risk-Free Rate) ÷ Beta of the Portfolio.  The Sharpe Ratio is calculated as follows: (Average Return of a Portfolio - Average Return of the Risk-Free Rate) ÷ Annualized Standard Deviation of the Portfolio.  The primary difference between the Treynor Ratio and the Sharpe Ratio is that the former utilizes beta or market risk to measure volatility, whereas the latter utilizes total risk or standard deviation.  The Sortino Ratio is calculated as follows: (Excess Return - Risk-Free Rate) ÷ Downside Semi-Variance.  The Sortino Ratio is a variation of the Sharpe Ratio and differentiates harmful volatility from volatility in general by using a value for downside deviation.

corresponding ratios of the benchmarks, the greater the risk-adjusted performance.  The converse is also true.  Thus, if Fund "A" and the benchmark portfolio each have 10% returns, but Fund A's Treynor, Sharpe and Sortino ratios are less than the benchmark portfolio's ratios, a risk-adjusted performance of the benchmark portfolio is better than Fund A's risk-adjusted performance.

**The Plan Fiduciaries Included and Kept Proprietary Funds in the Plan to Serve Their Own Self Interest or the Self-Interest of Their Employer**

64.    Throughout the Class Period, the Plan fiduciaries loaded the Plan with expensive and/or poorly performing proprietary mutual fund options.  Plan participants were given access to only five actively managed mutual fund investment options, each one of which was managed by GE Asset Management, with fees as high as 89 basis points ("bps").[6]  As GE and other GE Plan fiduciaries knew, GE Asset Management received tens of millions of dollars in fees each year for its management of the GE Funds.  For the Small Cap Equity Fund, GE Asset Management hired a number of sub advisers to manage that fund's investments, but continued to collect fees as a manager of managers for this fund and passed on the expenses of management of the fund to Plan participants.

65.    Between 2011 and 2016, GE through its wholly owned subsidiary, GE Asset Management, earned more than $175 million in fees from Plan participants as reflected in the chart below:

---

[6]    One basis point is equal to 0.01%, or 1/100th of a percent.  Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested.

**Estimated Total Expenses Paid by GE Plan Participants (in thousands)**[7]

| GE FUND | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | Total |
|---|---|---|---|---|---|---|---|---|
| **U.S. Income Fund (GESLX)** | $3,891 | $3,429 | $2,135 | $3,925 | $4,009 | $3,133 | $3,263 | $23,785 |
| **U.S. Equity Fund (GESSX)** | $5,579 | $5,882 | $5,175 | $3,771 | $4,434 | $4,131 | $4,177 | $33,150 |
| **International Equity Fund (SIEIX)** | $6,187 | $6,532 | $7,142 | $6,941 | $5,760 | $5,907 | $6,724 | $45,193 |
| **Small-Cap Equity Fund (SIVIX)** | $10,683 | $10,389 | $11,022 | $9,590 | $7,605 | $7,109 | $6,146 | $62,544 |
| **Strategic Investment Fund (SIIVX)** | $2,126 | $2,191 | $2,144 | $1,889 | $1,613 | $1,545 | $1,398 | $12,907 |
| **Totals** | **$28,466** | **$28,425** | **$27,194** | **$26,115** | **$23,421** | **$21,826** | **$21,708** | **$177,579** |

66.     As demonstrated in the chart above, GE steadily increased its GE Fund annual fees from $21 million to $28 million between 2010 and 2016.

67.     Rather than fulfilling their fiduciary duties by engaging in a disinterested and loyal process designed to serve the best interests of Plan participants, the Plan fiduciaries structured the Plan so that it contained underperforming and/or expensive proprietary funds to the benefit of Defendants and their affiliates and to the detriment of Plan participants.  The Plan fiduciaries could have, but failed to, include lower cost funds with comparable or better performance from unaffiliated fund managers.  Furthermore, the Plan fiduciaries breached their fiduciary duties by failing to remove imprudent investment options from the Plan.  The failure to select ***any*** non-proprietary, actively managed mutual funds as investment options in the Plan, despite the availability of hundreds of superior alternatives, demonstrates that the Plan fiduciaries did not

---

[7]     To determine the total expenses paid by shareholders to GE, the average net assets for each year were multiplied by the corresponding net expense ratio for each year.  The net expense ratio is the percentage of fund assets paid for operating expenses and management fees.

seriously consider non-proprietary mutual funds in their investment selection process, but rather only self-serving GE-affiliated funds.

68.     The Plan fiduciaries selection of these investment options in the Plan was vital to GE's mutual fund business and the growth of its bottom line.  At all relevant times, assets from Plan participants constituted a substantial majority of the GE Funds' assets, ranging from approximately 40% of all fund assets to approximately 96% of all fund assets depending on the fund and the year, as detailed in the following chart:

### Percentage of Each GE Fund's Assets from Plan Participants[8]

| GE Fund | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|
| Strategic Investment Fund | 76% | 78% | 73% | 67% | 64% | 65% |
| Small Cap Equity Fund | 92% | 93% | 93% | 96% | 93% | 90% |
| Institutional Equity Fund | 86% | 86% | 77% | 69% | 58% | 40% |
| U.S. Equity Fund | 71% | 71% | 71% | 70% | 69% | 69% |
| Income Fund | 67% | 72% | 71% | 67% | 65% | 69% |

69.     In addition to earning lucrative fees from Plan participants, Defendants used Plan participants as a captive investor base to prop up underperforming or failing mutual funds in the lead up to the sale of GE Asset Management.  For example, between December 31, 2011 and December 31, 2016, the International Equity Fund suffered from massive investor redemptions that decreased the amount of assets in the fund (together with poor performance) from approximately $2.36 billion to approximately $1.19 billion, a decrease of nearly 50%.  At the same time, the amount of assets invested in the International Equity Fund by Plan participants actually **_increased_**, from approximately $947 million to over $1 billion.  As a result, the

---

[8]     As of December 31st of the calendar year.

proportion of the International Equity Fund that consisted of Plan participant assets more than doubled from approximately 40% to approximately 86%.

70.   Similarly indicative of the reliance by GE Asset Management on assets from Plan participants to prop up its underperforming mutual funds, after GE Asset Management was acquired by State Street it was announced that the Strategic Investment Fund would be wound down and shuttered to new investments.   Additionally, to ensure maximum retention of the GE Fund assets, the terms of the Plan provided that investment earnings are "automatically" reinvested in the same investment option, except for GE stock dividends.

**Each of the GE Funds Was an Imprudent and Disloyal Investment**

71.   Self-interest tainted the selection of investment options for the Plan.   The Plan fiduciaries selected GE's proprietary funds not through an objective process based on their merits as investments or because doing so was in the interest of Plan participants, but because these products provided significant revenues and profits to GE and GE Asset Management.   The GE Funds consistently suffered from high fees, poor performance, or both, and posed significantly greater risk than comparable, readily apparent investment options.   In fact, as demonstrated below, comparable investment options had significantly less risk and/or better risk-adjusted returns.   A prudent, loyal fiduciary under these circumstances would not have selected or retained such poor-performing investments.

72.   For the actively managed investment strategies, the Plan fiduciaries offered participants the single option of a GE proprietary mutual fund geared to that strategy, even though comparable but better performing investment options were readily available.   Despite their ongoing underperformance during the Class Period, the Plan fiduciaries retained the GE Funds as investment options in the Plan even though any prudent fiduciary monitoring the Plan would have removed them as early as 2011.

73.    The Plan fiduciaries retained the GE Funds, knowing their performance and expenses were worse than more prudent options, benchmarks and market averages and/or failed to have a prudent process in place to ensure the affiliated investments were removed from the Plan.   Notably, during the Class Period, Defendants failed to meet their fiduciary obligations since a cursory review of the GE Funds would have revealed their imprudence.   Knowing of their significant self-interest in the GE Funds, the Company, and the Plan fiduciaries, failed to appoint an independent fiduciary to evaluate and monitor the Plan's investment options.

74.    Defendants GE and GE Asset Management stood to, and did, benefit from the fees charged to Plan participants for managing the GE Funds.   Had the Plan fiduciaries offered any of the readily apparent, better-performing, non-proprietary alternatives, GE and GE Asset Management would have lost out on more than $175 million in fees collected from Plan participants from 2010 through 2016, and GE would not have earned approximately $400 million from the $485 million sale of GE Asset Management to State Street.   The sale of GE Asset Management to State Street would not have occurred without the assets of Plan participants and even if GE could have entered a deal, it would have been for a considerably lower amount. Accordingly, the process used by GE to select and maintain its investment options was tainted by failure of effort, competence and/or disloyalty.

**International Equity Fund**

75.    The International Equity Fund ("SIEIX") is a Plan investment option managed by GE Asset Management.   The fund seeks long-term growth of capital by investing at least 80% of its net assets in equity securities, such as common and preferred stocks.   The International Equity Fund invests primarily in companies in both developed and emerging market countries outside the United States.   If Plan participants wanted to invest in an actively managed strategy focused on international equities, the International Equity Fund was their only Plan option.

76.   In the years leading up to the Class Period, the International Equity Fund consistently performed worse than comparable mutual funds in the same investment category.  In 2008, the fund lost 44.35%, placing it in the bottom 55% of other mutual funds in the same Foreign Large Blend investment category, according to Morningstar.  In 2009, the fund performed in the bottom 70% of mutual funds in the Foreign Large Blend category, and in 2010, the fund performed in the bottom 90% of this category according to Morningstar, which indicated that the fund's performance relative to its competitors was actually deteriorating.

77.   As of December 19, 2017, the International Equity Fund underperformed its benchmark, the "MSCI EAFE" for the one year, five year and ten year periods.  Additionally, the International Equity Fund failed to outperform its benchmark, the MSCI EAFE Index, in 2011, 2013, 2014 and 2016.

78.   The International Equity Fund's Annual Report indicates that in 2016 there were 879 comparable "peer group" funds as defined by Morningstar.  In 2016, the average annual return for these Funds was 6.71%, while the average annual return for the International Equity Fund was only 5.32% - 139 bps lower.

79.   If the Plan fiduciaries had faithfully executed their fiduciary duties to the Plan and its participants they would have selected one of the hundreds of better performing funds available with comparable strategies.  For example, as of December 19, 2017, the MFS International Value Fund ("MINJX") achieved a five-year trailing return of 12.79%, or approximately 6.78% above the return achieved by the International Equity Fund during this timeframe.  Similarly, as of December 19, 2017 the Oakmark International Investor fund ("OANIX") achieved a five-year trailing return of 10.37%, or approximately 4.36% above the return achieved by the International Equity Fund during this timeframe.

80.   Even certain funds that charged lower fees than the International Equity Fund achieved superior rates of return.  This is significant because, as one of the largest retirement plans in the United States, the Plan should have been able to provide Plan participants with investment options that achieved superior returns at a fraction of the cost to retail investors or even other, smaller retirement plans.  GE Asset Management charged investor class shares in the International Equity Fund fees and expenses ranging from 0.55% to 0.57%.  By contrast, the DFA International Core Equity Portfolio I fund ("DFIEX") charged investors fees and expenses of 0.38% to 0.39%.  Yet, as of December 19, 2017, this fund achieved a superior five-year trailing return of 9.10%, or approximately 3.09% above the return achieved by the International Equity Fund during this timeframe.

81.   The following table summarizes the poor performance and cumulative harm to investors in the International Equity Fund as compared to other available investment alternatives that were not included in the Plan:

**GE ERISA**
**International Equity Fund (SIEIX) As Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **SIEIX** | **-15.89%** | **20.79%** | **21.65%** | **-7.68%** | **-0.46%** | **-0.97%** | **12.47%** | **1.98%** |
| MFS International Value Fund (MINJX) | -1.81% | 16.13% | 27.80% | 1.61% | 6.85% | 4.31% | **65.04%** | 8.71% |
| +/-SIEIX | 14.08% | -4.66% | 6.15% | 9.29% | 7.31% | 5.28% | 52.56% | 6.73% |
| OakMark International Equity (OANIX) | -14.07% | 29.22% | 29.34% | -5.41% | -3.83% | 7.96% | **41.04%** | 5.90% |
| +/-SIEIX | 1.82% | 8.43% | 7.69% | 2.27% | -3.37% | 8.93% | 28.57% | 3.92% |
| Schwab International Core Equity Fund (SICNX) | -12.10% | 23.73% | 23.95% | -4.49% | 3.40% | 1.84% | **35.58%** | 5.20% |
| +/-SIEIX | 3.79% | 2.94% | 2.30% | 3.19% | 3.86% | 2.81% | 23.11% | 3.23% |
| AQR International Equity Fund Class I (AQIIX) | -15.00% | 22.87% | 23.97% | -7.55% | 1.95% | 3.12% | **25.84%** | 3.90% |
| +/-SIEIX | 0.89% | 2.08% | 2.32% | 0.13% | 2.41% | 4.09% | 13.37% | 1.93% |
| DFA International Core Equity (DFIEX) | -15.11% | 18.74% | 23.43% | -5.98% | -0.21% | 5.34% | **22.96%** | 3.51% |
| +/-SIEIX | 0.78% | -2.05% | 1.78% | 1.70% | 0.25% | 6.31% | 10.49% | 1.53% |

82.    As the chart above shows, the International Equity Fund's cumulative return from 2011 through 2016 was only 12.47%, compared to available alternative investments such as MINJX, OANIX, SICNX, AQIIX and DFIEX, which returned 65.04%, 41.04%, 35.58%, 25.84% and 22.96%, respectively, during that period.  Thus, MINJX achieved cumulative returns that were ***52.56% more*** than the International Equity Fund representing a 421% increase in returns when compared to the International Equity Fund.    Even the "worst" performing comparable fund in this group, DFIEX achieved cumulative returns that were 10.49% more than the International Equity Fund, representing an 84% increase in returns when compared to the International Equity Fund.    Similarly, the compound annual growth rate ("CAGR") of the International Equity Fund amounted to only 5.98% during the 2011 to 2016 period.    By comparison, the MINJX, OANIX, SICNX, AQIIX and DFIEX, funds achieved superior CAGRs of 8.71%, 5.90%, 5.20% 3.90% and 3.51%, respectively, during that period.

83.    Furthermore, the average fund in the International Equity Fund's Morningstar category, the Foreign Large Blend category, achieved greater risk-adjusted returns for the trailing five-year period as compared to the International Equity Fund.  Each of the Treynor, Sharpe and Sortino ratios for the average fund in the fund's Morningstar category were greater than the International Equity Fund's corresponding ratios.    The International Equity Fund's Treynor, Sharpe and Sortino ratios were 6.79, 0.60 and 0.95, respectively, while the ratios for the Foreign Large Blend category average were significantly greater at 8.32, 0.71 and 1.18, respectively, denoting significantly less risk and/or better risk-adjusted returns.

84.    Defendants used Plan participants as a captive investor base to prop up the International Equity Fund even as it experienced a rash of redemptions from non-Plan participants during the Class Period as a result of poor performance.  From 2011 to 2016, the

fund experienced a net outflow of investor assets.  The fair value of the total investments in the fund declined from $2.36 billion as of December 31, 2011, to $1.19 billion by December 31, 2016, a decline of nearly 50%.  Meanwhile, the fair value of Plan participants' assets in the fund actually *increased* during this same timeframe, from about $950 million to over $1 billion.  As a result, the proportion of the International Equity Fund that consisted of assets from Plan participants more than doubled, from about 40% as of December 31, 2011 to about 86% by December 31, 2016.  A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the International Equity Fund from the Plan.  Defendants, however, had business and financial incentives to keep the International Equity Fund in the Plan. Even though the International Equity Fund performed poorly, GE Asset Management – and thereby GE – collected millions of dollars in advisory fees from Plan participants.  Furthermore, the International Equity Fund's fee revenue enhanced the value of GE Asset Management, which factored into the reported $485 million price GE received from its 2016 sale of GE Asset Management to State Street.

**Strategic Investment Fund**

85.    The Strategic Investment Fund (or "SIIVX") was a Plan investment option managed by GE Asset Management.  It was removed by the BPIC in October 2017 as a Plan investment option and as of November 30, 2017 went out of business.  The fund sought maximum total return (total return includes both income and capital appreciation) by investing primarily in a combination of U.S. and non-U.S. equity and debt securities and cash.  If Plan participants wanted to invest in an actively managed mixed equity/debt strategy, the Strategic Investment Fund was their only Plan option.

86.    In the years leading up to the Class Period, the Strategic Investment Fund consistently performed worse than comparable mutual funds in the same investment category.  In

2008, the fund lost 28.88%, placing it in the bottom 55% of other mutual funds in the same Moderate Allocation category, according to Morningstar.  In 2009, the fund performed in the bottom 67% of mutual funds in the Moderate Allocation category, and in 2010, the fund performed in the bottom 85% of this category according to Morningstar, which indicated that the fund's performance relative to its competitors was actually deteriorating.

87.    The performance of the Strategic Investment Fund remained subpar during the Class Period.  The fund failed to outperform its Morningstar benchmark, the MS Moderate Target Risk Index, in 2011, 2014 and 2016.[9]  The fund also performed worse than the average fund in its Morningstar category, the Moderate Allocation category, during 2011, 2014 and 2016. Prior to closing its doors for business in November 2017, its five-year trailing return of 7.97% was in the bottom 58% of funds in the Moderate Allocation category.  Similarly, its three-year trailing return of 6.24% was in the bottom 53% of funds in the Moderate Allocation category.

88.    More than 900 funds make up the Moderate Allocation category (defined as funds with a 50% to 70% equity allocation), meaning that the Plan fiduciaries had hundreds of better performing, non-proprietary mutual funds to choose from at the start of the Class Period that offered a comparable investment strategy.  The Plan fiduciaries, however, did not select these funds for inclusion in the Plan which enabled GE to earn millions of dollars in fee income.

89.    If the Plan fiduciaries had faithfully executed their fiduciary duties to the Plan and its participants, they would have selected one of the hundreds of better performing funds available with a comparable strategy.  For example, as of December 19, 2017, the T. Rowe Price

---

[9]    The fund uses three benchmarks: the S&P 500 Index, the MSCI All Country World ex-US Index and the Barclays Capital U.S. Aggregate Bond Index.  Instead of using three indexes, or calculating some blended average, the Morningstar benchmark is a reasonable alternative and designed to serve as an appropriate benchmark for funds with a similar investment strategy and risk profile to that of the Strategic Investment Fund.

Capital Appreciation fund ("PRWCX") achieved a five-year trailing return of 12.61%, or approximately 4.64% above the return achieved by the Strategic Investment Fund during this timeframe.

90.   Even certain funds that charged less fees than the Strategic Investment Fund achieved superior rates of return.  This is significant because, as one of the largest retirement plans in the United States, the Plan should have been able to provide Plan participants with investment options that achieved superior returns at a fraction of the cost to retail investors or even other smaller retirement plans.  GE Asset Management charged investor class shares in the Strategic Investment Fund fees and expenses ranging from 0.34% to 0.36% until the sale of GE Asset Management to State Street.[10]  By contrast, the American Funds American Balanced Fund Class R-6 ("RLBGX") charged investors fees and expenses of approximately 0.29% for a comparable strategy.  Yet, as of December 19, 207 this fund achieved a superior five-year trailing return of 11.26%, or approximately 3.29% above the return achieved by the Strategic Investment Fund during this timeframe.  Similarly, the Vanguard Wellington Fund Admiral Shares ("VWENX") charged fees and expenses of approximately 0.16% to 0.18% for a comparable strategy.  Yet, as of December 19, 2017, this fund achieved a superior five-year trailing return of 10.53%, or approximately 2.81% above the return achieved by the Strategic Investment Fund during this timeframe.

91.   The following table summarizes the poor performance and cumulative harm to investors in the Strategic Investment Fund as compared to other available investment alternatives that were not included in the Plan:

---

[10]   In early 2017, after the sale to State Street, GE Asset Management adopted a partially passive investment strategy for the Strategic Investment Fund and lowered the fees and expenses charged to investors to 0.32%, including waivers.

**GE ERISA**
**GE Strategic Investment Fund (SIIVX) As Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **SIIVX** | **-2.56%** | **12.85%** | **16.78%** | **4.88%** | **-1.18%** | **5.52%** | **40.44%** | **5.82%** |
| T. Rowe Price Capital Appreciation Fund (PRWCX) | 3.19% | 14.70% | 22.43% | 12.25% | 5.42% | 8.22% | **85.57%** | 10.85% |
| +/-SIIVX | 5.75% | 1.85% | 5.65% | 7.37% | 6.60% | 2.70% | 45.13% | 5.03% |
| Dodge & Cox Balanced Fund (DODBX) | -1.66% | 18.32% | 28.37% | 8.87% | -2.87% | 16.56% | **84.10%** | 10.71% |
| +/-SIIVX | 0.90% | 5.47% | 11.59% | 3.99% | -1.69% | 11.04% | 43.67% | 4.88% |
| American Funds American Balanced (RLBGX) | 4.16% | 14.57% | 22.12% | 9.22% | 2.03% | 8.90% | **76.85%** | 9.97% |
| +/-SIIVX | 6.72% | 1.72% | 5.34% | 4.34% | 3.21% | 3.38% | 36.42% | 4.15% |
| Vanguard Wellington Fund Admiral Shares (VWENX) | 3.95% | 12.67% | 19.76% | 9.90% | 0.14% | 11.09% | **71.48%** | 9.41% |
| +/-SIIVX | 6.51% | -0.18% | 2.98% | 5.02% | 1.32% | 5.57% | 31.05% | 3.58% |
| Fidelity Puritan Fund (FPURX) | 0.67% | 13.79% | 20.34% | 10.75% | 1.77% | 5.03% | **63.19%** | 8.50% |
| +/-SIIVX | 3.23% | 0.94% | 3.56% | 5.87% | 2.95% | -0.49% | 22.75% | 2.68% |

92.     As the chart above shows, the Strategic Investment Fund's cumulative return from 2011 to 2016 was only 40.44%, compared to available alternative investments such as PRWCX, DODBX, RLBGX, VWENX, and FPRUX which returned 85.57%, 84.10%, 76.85%, 71.48%, and 63.19% respectively, during that period.  Thus, PRWCX achieved cumulative returns that were ***45.13% more*** than the Strategic Investment Fund representing a 111% increase in returns when compared to the Strategic Investment Fund.  Even the "worst" performing comparable fund in this group, FPRUX, achieved cumulative returns that were 22.75% more than the Strategic Investment Fund, representing a 63.19% increase in returns when compared to the Strategic Investment Fund.  Similarly, the CAGR of the Strategic Investment Fund amounted to only 7.58% during the 2011 to 2016 period.  By comparison, the PRWCX, DODBX, RLBGX, VWENX, and FPRUX funds achieved superior CAGRs of 10.85%, 10.71%, 9.97%, 9.41%, and 8.50% respectively, during that period.

93.     Furthermore, the average fund in the Strategic Investment Fund's Morningstar category, the Moderate Allocation category, achieved greater risk-adjusted returns for the trailing

five-year period as compared to the Strategic Investment Fund.  Each of the Treynor, Sharpe and Sortino ratios for the average fund in the fund's Morningstar category were greater than the Strategic Investment Fund's corresponding ratios.  The Strategic Investment Fund's Treynor, Sharpe and Sortino ratios were 6.77, 1.10 and 1.95, respectively, while the ratios for the average fund in the Moderate Allocation category were significantly greater at 7.12, 1.12 and 2.06, respectively, denoting significantly less risk and/or better risk-adjusted returns.

94.    Defendants used Plan participants as a captive investor base to prop up the Strategic Investment Fund.  Throughout the Class Period, the proportion of assets in the Strategic Investment Fund made up of Plan participant assets exceeded 60%.  Indeed, even as the amount of non-Plan participant assets in the fund decreased, the fair value of Plan assets in the fund increased.  For example, as of December 31, 2011, Plan assets made up $442 million of $685 million in overall assets in the fund (or 65%), meaning that non-Plan assets constituted $243 million.  By December 31, 2016, Plan assets made up $585 million of $772 million in overall assets in the fund (or 76%), meaning that non-Plan assets had declined to $187 million, or by more than 23%, even as Plan assets in the fund had increased by over 32%.  In other words, as other investors were fleeing the Strategic Investment Fund, the Plan fiduciaries kept the fund in the Plan as the only available actively managed bond/stock mixed strategy investment option and failed to replace the fund with more prudent options despite the fact that such options were readily available.  Notably, after State Street purchased GE Asset Management, GE Asset Management announced that it would be winding down the Strategic Investment Fund and closing the fund to new investors.

95.    A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the Strategic Investment Fund from the Plan.  Defendants, however, had

business and financial incentives to keep the Strategic Investment Fund in the Plan.  Even though the Strategic Investment Fund performed poorly, GE Asset Management – and thereby GE – collected millions of dollars in advisory fees from Plan participants.  Furthermore, the Strategic Investment Fund's fee revenue enhanced the value of GE Asset Management, which factored into the reported $485 million price GE received from its sale of GE Asset Management to State Street.

**U.S. Equity Fund**

96.   The U.S. Equity Fund ("GESSX") is a Plan investment option managed by GE Asset Management.  The fund seeks long-term growth of capital and income by investing at least 80% of its net assets in equity securities of U.S. companies, such as common and preferred stocks.  The fund primarily invested in large cap U.S. equities during the Class Period.  If Plan participants wanted to invest in an actively managed large cap strategy, the U.S. Equity Fund was their only Plan option.

97.   In the years leading up to the Class Period, the U.S. Equity Fund performed worse than comparable mutual funds in the same investment category.  In 2009, the fund achieved total returns in the bottom 60% among funds in the Morningstar Large Growth investment category, and, in 2010, the fund achieved total returns in the bottom 87% of the Morningstar Large Growth investment category, which indicated that the fund's performance relative to its competitors was actually deteriorating.

98.   The performance of the U.S. Equity Fund remained subpar during the Class Period. The fund failed to outperform its benchmark, the S&P 500 Index, in 2011, 2014, 2015 and 2016. The fund also performed worse than the average fund in its category during 2011, 2015 and 2016.  As of December 19, 2017 its three-year trailing return of 8.99% was in the bottom 71% of

funds in the Morningstar Large Blend category.[11]   Additionally, as of December 19, 2017, the Fund underperformed its benchmark for the one year, five year, and ten year trailing period.

99.   More than 1,300 funds make up the Large Blend category, meaning that Defendants had hundreds of better performing, non-proprietary mutual funds to choose from that offered comparable investment strategies.  The Plan fiduciaries, however, did not select these funds for inclusion in the Plan, which enabled GE to earn millions of dollars in fee income.

100.   If the Plan fiduciaries had faithfully executed their fiduciary duties to the Plan and its participants they would have selected one of the hundreds of better performing funds available with comparable strategies.  For example, as of December 19, 2017, the Edgewood Growth Fund Class I ("EGFIX") achieved a five-year trailing return of 19.48%, or approximately 4.81% above the return achieved by the U.S. Equity Fund during this timeframe. Likewise, as of December 19, 2017, the T. Rowe Price Institutional Large Cap Growth Fund ("TRLGX") achieved a five-year trailing return of 19.73%, or approximately 5.06% above the return achieved by the U.S. Equity Fund during this timeframe.  Even the low-cost option Vanguard Growth and Income Fund ("VGIAX"), as of December 19, 2017, achieved a five-year trailing return of 15.86%, or approximately 1.19% above the return achieved by the U.S. Equity Fund during this timeframe.

101.   The following table summarizes the poor performance and cumulative harm to investors in the U.S. Equity Fund as compared to other available investment alternatives that were not included in the Plan:

---

[11]   Morningstar alternatively lists the fund in the Large Growth and the Large Blend investment categories.

**GE ERISA**
**GE U.S. Equity Fund (GESSX) As Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **GESSX** | -2.16% | 16.78% | 35.15% | 13.27% | -2.05% | 10.13% | **88.68%** | **11.16%** |
| Edgewood Growth Class Institutional Fund (EGFIX) | 3.73% | 18.72% | 37.19% | 13.50% | 11.59% | 3.57% | **121.62%** | 14.18% |
| +/-GESSX | 5.89% | 1.94% | 2.04% | 0.23% | 13.64% | -6.56% | 32.94% | 3.02% |
| Fidelity Growth Company (FDGRX) | 0.67% | 18.52% | 37.61% | 14.44% | 7.83% | 6.01% | **114.79%** | 13.59% |
| +/-GESSX | 2.83% | 1.74% | 2.46% | 1.17% | 9.88% | -4.12% | 26.11% | 2.43% |
| T. Rowe Price Institutional Large Cap Growth Fund (TRLGX) | -1.40% | 17.55% | 44.44% | 8.72% | 10.08% | 2.85% | **108.99%** | 13.07% |
| +/-GESSX | 0.76% | 0.77% | 9.29% | -4.55% | 12.13% | -7.28% | 20.31% | 1.91% |
| PRIMECAP Odyssey Growth Fund (POGRX) | -2.22% | 16.76% | 39.30% | 13.92% | 6.18% | 8.42% | **108.57%** | 13.03% |
| +/-GESSX | -0.06% | -0.02% | 4.15% | 0.65% | 8.23% | -1.71% | 19.89% | 1.87% |
| Vanguard Growth and Income Fund (VGIAX) | 2.54% | 17.05% | 32.74% | 14.16% | 2.03% | 12.12% | **108.06%** | 12.99% |
| +/-GESSX | 4.70% | 0.27% | -2.41% | 0.89% | 4.08% | 1.99% | 19.38% | 1.83% |

102. As the chart above shows, the U.S. Equity Fund's cumulative return during the 2011 through 2016 period was only 88.68%, compared to available alternative investments such as EGFIX, FDGRX, TRLGX, POGRX, and VGIAX which returned 121.62%, 114.79% 108.99%, 108.57% and 108.06%, respectively, during that period.  Thus, EGFIX achieved cumulative returns that were ***32.94% more*** than the U.S. Equity Fund representing a 34% increase in returns when compared to the U.S. Equity Fund.  Even the "worst" performing comparable fund in this group, VGIAX, achieved cumulative returns that were 19.38% more than the U.S. Equity Fund, representing a nearly 22% increase in returns when compared to the U.S. Equity Fund.  Similarly, the CAGR of the U.S. Equity Fund amounted to only 14.04% during the 2011 through 2016 period.  By comparison, the EGFIX, FDGRX, TRLGX, POGRX, and VGIAX funds achieved superior CAGRs of 14.18%, 13.59% 13.07%, 13.03% and 12.99%, respectively, during that period.

103. Furthermore, the average fund in the U.S. Equity Fund's Morningstar category, the Large Growth category, achieved greater risk-adjusted returns for the trailing five-year period as compared to the U.S. Equity Fund.  Each of the Treynor, Sharpe and Sortino ratios for the average fund in the fund's Morningstar category were greater than the U.S. Equity Fund's corresponding ratios.  The U.S. Equity Fund's Treynor, Sharpe and Sortino ratios were 12.48, 1.25 and 2.27, respectively, while the ratios for the average fund in the Large Growth category were significantly greater or the same at 12.73, 1.25 and 2.79, respectively, denoting significantly less risk and/or better risk-adjusted returns.

104. Defendants used Plan participants as a captive investor base to prop up the U.S. Equity Fund.  Throughout the Class Period, Plan participant assets in the fund ranged from about $2.5 billion to nearly $3.5 billion.

105. A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the U.S. Equity Fund from the Plan.  Defendants, however, had business and financial incentives to keep the U.S. Equity Fund in the Plan.  Even though the U.S. Equity Fund performed poorly, GE Asset Management – and thereby GE – collected millions of dollars in advisory fees from Plan participants.  Furthermore, the U.S. Equity Fund's fee revenue enhanced the value of GE Asset Management, which factored into the reported $485 million price GE received from its 2016 sale of GE Asset Management to State Street.

**Income Fund**

106. The Income Fund ("GESLX") is a Plan investment option managed by GE Asset Management.  The fund seeks a high interest rate of return over a long-term period consistent with the preservation of capital by investing at least 80% of its net assets in debt securities.  These goals, according to the Plan Document, were to be pursued "consistent with prudent investment management and preservation of capital."  The fund primarily invested in debt

securities with a maturity rate of more than one year during the Class Period.  If Plan participants wanted to invest in an actively managed intermediate bond strategy, the U.S. Income Fund was their only Plan option.

107.  Throughout the Class Period, the performance of the Income Fund varied.  In two years, 2014 and 2015, it failed to clear its benchmark, the Barclays U.S. Aggregate Bond Index. Several funds in the Morningstar Intermediate-Term Bond Category, which contains more than 900 funds, were available to Defendants that offered investors comparable, or even superior, returns.  Defendants, however, did not select these funds for inclusion in the Plan which enabled GE to earn millions of dollars in fee income.

108.  If the Plan fiduciaries had faithfully executed their fiduciary duties to Plan participants they would have selected one of the many funds available to them with comparable strategies.  For example, as of December 19, 2017 the Morgan Stanley Institutional Fund Trust Core Plus Fixed Income Portfolio Class I ("MPFIX") achieved a five-year trailing return of 4.98%, or approximately 2.49% above the return achieved by the Income Fund during this timeframe.   Likewise, as of December 19, 2017, the Alliance Bernstein Income Fund ("AKGAX") achieved a five-year trailing return of 3.51%, or approximately 1.02% above the return achieved by the Income Fund during this timeframe.  Similarly, as of December 19, 2017, the BlackRock Total Return Fund Institutional Shares ("MAHQX") achieved a five-year trailing return of 3.13%, or approximately 0.64% above the return achieved by the Income Fund during this timeframe.

109.  The following table summarizes the poor performance and cumulative harm to investors in the Income Fund as compared to other available investment alternatives that were not included in the Plan:

**GE ERISA**
**GE Income Fund (GESLX) As Compared to Group Peer Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **GESLX** | **8.01%** | **5.87%** | **-0.85%** | **5.83%** | **0.34%** | **3.50%** | **24.61%** | **3.74%** |
| Morgan Stanley Institutional Fund (MPFIX) | 6.19% | 10.00% | -0.23% | 8.08% | -0.30% | 12.03% | **40.69%** | 5.85% |
| +/-GESLX | -1.82% | 4.13% | 0.62% | 2.25% | -0.64% | 8.53% | 16.08% | 2.12% |
| AB Income Fund Class A (AKGAX) | 9.40% | 11.87% | -3.10% | 8.69% | 0.44% | 5.42% | **36.48%** | 5.32% |
| +/-GESLX | 1.39% | 6.00% | -2.25% | 2.86% | 0.10% | 1.92% | 11.87% | 1.59% |
| DoubleLine Total Return Bond Fund Classs I (DBLTX) | 9.51% | 9.16% | 0.02% | 6.73% | 2.32% | 2.17% | **33.41%** | 4.92% |
| +/-GESLX | 1.50% | 3.29% | 0.87% | 0.90% | 1.98% | -1.33% | 8.80% | 1.19% |
| Voya Intermediate Bond Portfolio Class I (IPIIX) | 7.54% | 9.39% | -0.12% | 6.67% | 0.60% | 4.33% | **31.55%** | 4.68% |
| +/-GESLX | -0.47% | 3.52% | 0.73% | 0.84% | 0.26% | 0.83% | 6.94% | 0.94% |
| BlackRock Total Return Fund (MAHQX) | 4.53% | 10.46% | -0.20% | 8.05% | 0.35% | 3.45% | **29.26%** | 4.37% |
| +/-GESLX | -3.48% | 4.59% | 0.65% | 2.22% | 0.01% | -0.05% | 4.65% | 0.63% |

110. As the chart above shows, the Income Fund's cumulative return during the 2011 through 2016 period was only 24.61%, compared to available alternative investments such as MPFIX, AKGAX, DBLTX, IPIIX, and MAHQX, which returned 40.69%, 36.48%, 33.41%, 31.55%, and 29.26% respectively, during that period. Thus, MPFIX achieved cumulative returns that were *16.08% more* than the Income Fund representing a 65% increase in returns when compared to the Income Fund. Even the "worst" performing comparable fund in this group, MAHQX, achieved cumulative returns that were 4.65% more than the Income Fund, representing a 19% increase in returns when compared to the Income Fund. Similarly, the CAGR of the Income Fund amounted to only 2.90% during the 2011 to 2016 period. By comparison, the MPFIX, AKGAX, DBLTX, IPIIX, and MAHQX, funds achieved superior CAGRs of 5.85%, 5.32%, 4.92%, 4.68% and 4.37% respectively, during that period.

111.   The Plan fiduciaries used Plan participants as a captive investor base to prop up the Income Fund.   Throughout the Class Period, Plan participant assets in the fund ranged from about $1.8 billion to over $2.2 billion.

112.   A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the Income Fund from the Plan.   Defendants, however, had business and financial incentives to keep the Income Fund in the Plan.   Even though the Income Fund experienced mediocre performance, GE Asset Management – and thereby GE – collected millions of dollars in advisory fees from Plan participants.   Furthermore, the Income Fund's fee revenue enhanced the value of GE Asset Management, which factored into the reported $485 million price GE received from its 2016 sale of GE Asset Management to State Street.

**Small Cap Equity Fund**

113.   The Small Cap Equity Fund ("SIVIX") is a Plan investment option managed by GE Asset Management as a manger-of-managers.   The fund seeks long-term growth of capital by investing at least 80% of its net assets in equity securities of smaller companies, such as common and preferred stocks.   Rather than manage the Small Cap Equity Fund directly, GE Asset Management contracted out advisory services for the fund to a number of sub-advisors and retained a fee from Plan participants above and beyond what was paid to the sub-advisors.   If Plan participants wanted to invest in an actively managed small cap strategy, the Small Cap Equity Fund was their only Plan option.

114.   Throughout the Class Period, the performance of the Small Cap Equity Fund varied. In two years, 2012 and 2015, it failed to clear its benchmark, the Russell 2000 Index.   In three years, 2012, 2013 and 2014, it failed to crack the top 50% of funds in the Morningstar Small Blend category.   Despite its at times middling performance, the fund charged fees as high 0.89%. Other funds in the Small Blend Category, which contains more than 800 funds, were available to

Defendants that offered investors comparable, or even superior, returns at lower costs. Defendants, however, did not select these funds for inclusion in the Plan which enabled GE to earn millions of dollars in fees.

115. If the Plan fiduciaries had faithfully executed their fiduciary duties to Plan participants they would have selected one of the many funds available to them with comparable strategies at a lower cost.  As one of the largest retirement plans in the United States, the Plan should have been able to provide Plan participants with investment options that achieved superior returns at a fraction of the cost to retail investors or even other smaller retirement plans. For example, the fees and expenses charged to investors in the Small Cap Equity Fund was 0.88% to 0.89%, this was 69% more than the 0.52% charged by the DFA U.S. Micro Cap Portfolio Institutional Class ("DFSCX").  Yet this fund achieved a superior five-year trailing return of 15.98%, or approximately 1.11% above the return achieved by the Small Cap Equity Fund during this timeframe.  Similarly, the fees and expenses charged to investors in the Small Cap equity fund was *67% more* than the fees and expenses the Vanguard Strategic Small-Cap Equity Fund ("VSTCX") charged investors.  Yet this fund achieved a superior five-year trailing return of 15.82%, or approximately 0.95% above the return achieved by the Small Cap Equity Fund during this timeframe.  Other funds that charged comparable fees, such as the Harbor Small Cap Value Fund Institutional Class ("HASCX"), which charged fees and expenses of 0.84% to 0.86%, achieved a superior five-year trailing return of 17.49%, or approximately 2.62% above the return achieved by the Small Cap Equity Fund during this timeframe.

116.  The Plan fiduciaries used Plan participants as a captive investor base to prop up the Small Cap Equity Fund.  Throughout the Class Period, the proportion of assets in the fund made up of Plan participant assets routinely *exceeded 90%*, with Plan participant assets in the fund

ranging from about $800 million to nearly $1.3 billion.  The Plan fiduciaries had considerable bargaining power to reduce fees and expenses and pass these savings on to Plan participants. Instead, the Plan fiduciaries used their power over Plan assets to include an excessively expensive mutual fund option in the Plan that would allow GE and GE Asset Management to reap profits as a manger-of-managers while contracting out advisory services for the fund to various sub-advisors.

117.  A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the Small Cap Equity Fund from the Plan.  However, the Plan fiduciaries had business and financial incentives to keep the Small Cap Equity Fund in the Plan.  Even though the Small Cap Equity Fund charged excessively high fees, GE Asset Management – and thereby GE – collected millions of dollars in advisory fees from Plan participants.  Furthermore, the Small Cap Equity Fund's fee revenue enhanced the value of GE Asset Management, which factored into the reported $485 million price GE received from its 2016 sale of GE Asset Management to State Street.

## CLASS ACTION ALLEGATIONS

118.  Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

> All participants in the GE Retirement Savings Plan (f/k/a General Electric Savings and Security Program) from October 30, 2011 to the date of Judgment who were invested in one or more of the GE Funds through the Plan.

> Excluded from the Class are (a) Defendants, (b) any fiduciaries of the Plan, (c) the officers and directors of GE and any entity in which GE has or had a controlling interest during the Class Period, and (d) members of the immediate families and their legal representatives, heirs, successors or assigns of any such excluded party.

**Impracticability of Joinder**

119. The members of the Class are so numerous that joinder of all members is impracticable. Based on the most recent Form 5500 filed with the DOL in 2016, as of January 1 2016, the Plan had over 240,000 participants.

**Commonality**

120. The issues of liability are common to all members of the Class and are capable of common answers as those issues primarily focus on Defendants' acts (or failure to act). The common issues include whether the Plan fiduciaries breached various fiduciary duties to the Plan, whether certain Defendants engaged in prohibited transactions, whether the fiduciary defendants are liable for their co-fiduciaries breaches, whether GE and GE Asset Management knowingly participated in these breaches and violations, whether the Plan suffered losses as a result of the fiduciary breaches and other violations and what is the appropriate relief for Defendants' violations of ERISA.

**Typicality**

121. Plaintiffs' claims are typical of the claims of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiffs' claims challenge whether the fiduciaries of the Plan acted consistently with their fiduciary duties, whether they engaged in prohibited transactions, whether the non-fiduciaries knowingly participated in those breaches and violations and whether those breaches or violations caused losses or otherwise harmed the Plan and their participants or resulted in profits to those fiduciaries and non-fiduciaries. These are claims common to, and typical of, other Class members and these claims seek recovery on behalf of the Plan. As is the case with all Class Members, whose accounts were invested in any of the GE Funds, the BPIC chose the funds representing the selected asset classes in which Plaintiffs invested in the Plan.

**Adequacy**

122.  Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

123.  Plaintiffs have no interests that conflict with those of the Class.  Defendants do not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

**Rule 23(b)(1)**

124.  The requirements of Rule 23(b)(1)(A) are satisfied in this case.  Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to uniformly act in the best interests of the Plan and their participants. As this action challenges whether the Plan fiduciaries acted consistently with their fiduciary duties to the Plan, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct in the administration of the Plan.

125.  The requirements of Rule 23(b)(1)(B) are satisfied in this case.  Administration of an ERISA plan requires that all similarly situated participants be treated consistently.  As such, whether Defendants fulfilled their fiduciary obligations with respect to the Plan and the Plan's participants in this action would, as a practical matter, be dispositive of the interests of the other members of the Class regardless of whether they are parties to the adjudication.

**Rule 23(b)(2)**

126.  The requirements of Rule 23(b)(2) are met in this action.  Defendants have applied the same or substantially similar investment policies and investment options in the Plan that cover all members of the Class.  The breaches and violations alleged against the Plan fiduciaries

(and the non-fiduciaries who participated in those breaches of violations) with respect to the Class relate to policies that applied to, respectively, all members of the Class.   As such, Defendants have acted or refused to act on grounds generally applicable to the Class as a whole.

127.   The primary relief sought on behalf of the Class is a determination that the Plan fiduciaries breached their fiduciary duties (and that the non-fiduciaries knowingly participated in those breaches or violations), a determination of the amount by which those breaches adversely affected the Plan, and an order requiring Defendants to make good those losses to the Plan and restore any profits to the Plan.   Such relief is accomplished by issuance of a declaration or an injunction and therefore the primary requested relief constitutes final injunctive or declaratory on behalf the Class with respect to the Plan.

**Rule 23(b)(3)**

128.   The requirements of Rule 23(b)(3) are also satisfied.   The common questions of law and fact concern whether the Plan fiduciaries breached their fiduciary duties to the Plan. Because Class members are those participants whose accounts were invested in the affected investments, common questions related to liability will necessarily predominate over individual questions.   Similarly, as relief will be on behalf of and will flow to the Plan, common questions related to remedies and relief will likewise predominate over individual issues.

129. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   The losses suffered by many of the individual members of the Class are relatively small in proportion to the substantial cost to bring this litigation, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.   The fiduciaries of the Plan have an obligation to treat all similarly situated participants similarly and are subject to uniform standards of conduct under ERISA.   Thus, the members of the Class have an interest in having this action proceed in a single

action.  As such, no Class member has an interest in individually controlling the prosecution of this matter.

130.  Plaintiffs and their counsel are aware of only one other lawsuit filed by a member of the Class concerning this controversy (which has not been consolidated with this action) *Haskins v. GE Corp., et al.*, 17-cv-01960 (S.D. Cal.), which Defendants have sought to transfer to this District.

131.  This District is the most desirable forum for concentration of this litigation because: (1) GE is headquartered in this District; (2) a number of the actions challenged by this Complaint took place in this District, chiefly, on information and belief, Investment Committee meetings; (3) the Plan is administered in or near this District; (4) many of the employees of the Company are located in or near this District; and (5) many of the employees of GE who are fiduciaries of the Plan can be found in this District.

132.  Given the nature of the allegations there are no difficulties likely to be encountered in the management of this matter as a class action.

## COUNT I

### Breach of Fiduciary Duties in Violation of ERISA §404(a)(1)(A) and (B) Against the Investment Committee Defendants and the Asset Management Defendants

133.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

134.  The Investment Committee Defendants were fiduciaries of the Plan under ERISA §3(21), 29 U.S.C. §1002(21), among other reasons, because according to the Silberstein Declaration, the BPIC and its members were the fiduciaries responsible for reviewing and who did review periodic reports on the performance of investment options and for considering any recommendations concerning the addition of new investment options or the suspension of any existing investment options not required to be offered by the Plan Document.

135. The Asset Management Defendants were fiduciaries of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) because they were designated in the Plan Document and the Trust Agreement as the Trustees of the Plan, were named fiduciaries under the Plan, managed and disposed of Plan investment options, were charged with making recommendations about the prudence of the Plan investments, including the GE Funds, and directed the available investment options to offer participants (other than the GE Stock Fund and U.S. Savings Bonds).

136. As fiduciaries of the Plan, the Investment Committee Defendants and the Asset Management Defendants were required pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

137. ERISA's duty of prudence required the Investment Committee Defendants and the Asset Management Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly.  *See* 29 C.F.R. §2550.404a-1.  The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

138. As described above, the Investment Committee Defendants and the Asset Management Defendants failed to properly evaluate the Plan's investments to ensure that each of

these investments remained prudent and failed to remove the GE Funds that were no longer prudent.

139.  The Asset Management Defendants and the Investment Committee Defendants had a conflict of interest to select and retain GE Funds as investment options for the Plan.  Acting in their self-interest, rather than the best interests of the Plan and its participants, the Investment Committee Defendants and the Asset Management Defendants imprudently and disloyally selected and retained investment options that performed poorly and/or charged excessive fees that benefited GE affiliated entities, rather than Plan participants, despite the availability of superior – and readily available – investment alternatives as detailed herein.  A prudent fiduciary, in possession of the same information, would have removed the GE Funds as investment options in the Plan, replaced them with more prudent, lower cost and/or better performing alternatives, and used the size, leverage and bargaining power of the Plan, which is one of the largest defined-contribution plans in the United States, to secure access to superior investment alternatives for Plan participants.

140.  The Investment Committee Defendants and the Asset Management Defendants breached their duties of prudence and loyalty with respect to the Plan by at least the following actions or omissions:

(a)     failing to properly investigate the availability of, and give appropriate consideration to, lower-cost funds with comparable or superior performance as alternatives to the GE Funds;

(b)     failing to evaluate on a regular basis the performance and fees and expenses of the GE Funds and the adverse impact of excessive fees and expenses on the long-term performance of the GE Funds;

(c)     failing to implement and employ an ongoing process to control the fees and expenses of the GE Funds;

(d)     considering and being motivated in whole or in part by the more than $175 million collected in fees, and need to increase the value of GE Asset Management (eventually resulting in a sale for $485 million) in order to drive revenues and profits to GE and its affiliated entities; and

(e)     failing to promptly remove the imprudent GE Funds.

141.  Through these actions and omissions, the Investment Committee Defendants and the Asset Management Defendants failed to discharge their duties with respect to the Plan: (A) solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); and (B) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

142.  As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced.  Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Investment Committee Defendants, the Asset Management Defendants and any non-fiduciary which knowingly

participated in these breaches are liable to disgorge all profits made as a result of these Defendants' breaches of the duties of loyalty and prudence.

## COUNT II

### Breaches of Fiduciary Duties in Violation of ERISA §404(a)(1)(A), (B) and (D) Against Defendant GE and the Pension Board Defendants

143. Plaintiff repeats and incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

144. According to Section XIV.A.3. of the Plan Document, the Pension Board had the following power, duty, obligation and responsibility with respect to the management and control of the operation and administration of the Plan (in addition to others): "[m]aking, amending and enforcing all appropriate rules and regulations." Pursuant to that authority, the Pension Board had the power, duty, obligation and responsibility to create any rules and regulations regarding the selection and retention of investments in the Plan, and even in the absence of the Pension Board actually making such rules or regulations, had the power, duty, obligation and responsibility to enforce any rules and regulations required by ERISA, including §§404(a) and 406, and the applicable DOL Regulations regarding the selection and retention of investments by the Plan.

145. Pursuant to Section XIV.A.1. of the Plan Document, except to the extent that "the management and control of the operation and administration of the Plan have been expressly allocated hereunder" (*i.e.*, in the Plan Document) to other fiduciaries, the control and management of the operation and administration of the Plan remained vested in the Company (*i.e.*, Defendant GE). Nothing in the Plan Document set forth that any other fiduciary of the Plan had authority with respect to the management and control of the operation and administration of the Plan regarding the selection of investment options for the Plan. As such, regardless of

whether other fiduciaries of the Plan actually exercised authority in selecting or retaining the investment options of the Plan, Defendant GE had the authority pursuant to the Section XIV.A.1. regarding the selection and retention of investment options in the Plan.

146. As fiduciaries of the Plan, the Pension Board Defendants and GE were required under ERISA §404(a)(1)(A), (B) and (D), 29 U.S.C. §1104(a)(1)(A), (B), and (D), to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of providing benefits to the participants and beneficiaries of the Plan; (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use; and (D) in accordance with the documents and instruments governing the Plan in so far as those documents are consistent with ERISA.

147. In response to Plaintiff LaTorre's request for documents pursuant to ERISA §104(b), 29 U.S.C. §1024(b), the Plan Administrator produced no documents setting forth any written rules or regulations made or amended by the Pension Board concerning the selection or retention of investments in the Plan.  Based on the lack of any such documents provided, the Pension Board did not make any rules or regulations concerning the selection or retention of investments by the Plan.

148. In response to Plaintiff LaTorre's request for documents pursuant to ERISA §104(b), 29 U.S.C. §1024(b), the Plan Administrator produced no documents evidencing that GE had taken any steps to protect the Plan or its participants in connection with the selection or retention of investments in the Plan and the Plan Administrator did not produce any documents evidencing that any other fiduciary had been delegated in writing, as required by Section XIV.A.5. of the Plan, to undertake these responsibilities.  Even if some other fiduciary had been

properly delegated to undertake these responsibilities, Defendant GE would have remained responsible to ensure that the delegated fiduciary had properly preformed those responsibilities.

149.   The Pension Board Defendants and Defendant GE breached their duties of prudence and loyalty with respect to the Plan by at least the following actions or omissions:

(a)      as to Defendant GE, failing to ensure that fiduciary authority was properly delegated to the Investment Committee and/or the Asset Management Defendants in connection with the selection or retention of investment options under the Plan;

(b)      as to Defendant GE and the Pension Board Defendants, failing to make or enforce appropriate rules and regulations or impose other restrictions regarding the proper investigation, selection or retention of investment options under the Plan;

(c)      failing to require that the Investment Committee Defendants or the Asset Management Defendants had properly investigated the availability of, and give appropriate consideration to, lower-cost funds with comparable or superior performance as alternatives to the GE Funds or to the extent that those fiduciaries were not properly delegated to so do, or did not do, ensuring that Defendant GE performed a proper investigation;

(d)      failing to require that the Investment Committee Defendants or the Asset Management Defendants evaluate on a regular basis the performance and fees and expenses of the GE Funds and the adverse impact of excessive fees and expenses on the long-term performance of the GE Funds or to the extent that those fiduciaries were not properly delegated to so do, or did not do, ensuring that Defendant GE performed a proper evaluation;

(e)      failing to require that the Investment Committee or the GEAM Committee implement and employ an ongoing process to control the fees and expenses of the GE Funds or

to the extent that those fiduciaries were not properly delegated to so do or did not do, ensuring that Defendant GE had an ongoing process in place;

(f)   failing to implement procedures whereby the Investment Committee or the GEAM Committee was not motivated in whole or in part by the prospect of GE collecting fees, and the desire to increase the value of GE Asset Management or to the extent that those fiduciaries were not properly delegated to so do or did not do, ensuring that Defendant GE was not motivated by such considerations; and

(g)   failing to require that the Investment Committee or the GEAM Committee promptly remove any imprudent GE Funds or to the extent that those fiduciaries were not properly delegated to so do or did not do, ensuring that Defendant GE had done so.

150.  Through these actions and omissions, among others, the Pension Board Defendants and  Defendant GE failed to discharge their duties with respect to the Plan: (A) solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (B) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); and (D) in accordance with the documents and instruments governing the Plan in so far as those documents are consistent with ERISA.

151.  As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Class suffered substantial losses in the form of higher fees and lower returns on their investments than they would have otherwise experienced.  Additionally and regardless of the

losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Pension Board Defendants, Defendant GE and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of these Defendants' breaches of fiduciary duties.

## COUNT III

**Prohibited Transactions in Violation of ERISA §406(a)(1) (A), (C) and (D)
Against Defendant GE, the Investment Committee Defendants,
the Asset Management Defendants, and GE Asset Management**

152.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

153.  ERISA §406(a)(1), 29 U.S.C. §1106(a)(1) provides, in pertinent part, that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

> (A)  sale or exchange, or leasing, of any property between the plan and a party in interest;

> \*  \*  \*

> (C)  furnishing of goods, services, or facilities between the plan and a party in interest;

> (D)  transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan . . . .

154.  Defendant GE, the Investment Committee Defendants and the Asset Committee Defendants are fiduciaries of the Plan within the meaning of ERISA §§3(21), 29 U.S.C. §§1002(21) that caused the Plan to offer the GE Funds options in the Plan and to continue offering the GE Funds as options in the Plan.

155.  As a fiduciary, an employer, and as the corporate parent of service providers for the Plan, Defendant GE is a party in interest under ERISA §3(14)(A), (C), (H), 29 U.S.C. §1002(14) (A), (C) and (H), respectively.

156.  As a service provider to the Plan, Defendant GE Asset Management was a party in interest within the meaning of ERISA §3(14)(B), (H) and/or (I), 29 U.S.C. §1002(14) (B), (H) and/or (I).

157. Defendant GE, the Investment Committee Defendants and/or the Asset Management Defendants caused the Plan to exclusively select the GE Funds as the sole actively managed investment options for the Plan managed by GE Asset Management.

158.  As GE Asset Management was a subsidiary of GE until the sale to State Street, Defendants GE and GE Asset Management must have known that those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest.

159.  These transactions were for more than reasonable compensation, not selected solely in the interests of Plan participants and/or were on terms less favorable than could have been procured if the transactions were the product of arm's-length negotiations and with outside investors.  As described throughout the Complaint, the compensation paid to parties in interest for the Small Cap Equity Fund investment option in the Plan was also unreasonably high.  These Defendants failed to consider or select lower cost investment alternatives, including those offered by unaffiliated investment managers.

160.  By selecting the GE Funds as the options in the Plan and by maintaining these as the options in the Plan, Defendant GE, the Investment Committee Defendants and the Asset Management Defendants caused the plan to engage in a prohibited transaction in violation of ERISA §406(a)(1) (A), (C) and (D), 29 U.S.C. §1106(a)(1) (A), (C) and (D).

161.  As parties in interest, Defendant GE and GE Asset Management are liable for these violations of ERISA §406(a)(1) (A), (C) & (D), 29 U.S.C. §1106(a)(1) (A), (C) and (D) pursuant to ERISA §502(a)(3).

162.  As a result of these prohibited transactions, Defendant GE Asset Management received and Plaintiffs and members of the Class paid millions of dollars in the form of higher fees and lower returns on their investments than they would have without these prohibited transactions.

## COUNT IV

### Prohibited Transactions in Violation of ERISA §406(b)(1) and (3) Against Defendant GE, the Investment Committee Defendants and the Asset Management Defendants

163.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

164.  ERISA §406(b), 29 U.S.C. §1106(b), provides, in pertinent part, that a fiduciary with respect to a plan shall not:

> (1) deal with the assets of the plan in his own interest or for his own account,

or

> (3)receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

165.  Defendant GE, the Investment Committee and the Asset Management Defendants are fiduciaries of the Plan within the meaning of ERISA §§3(21) and 406(b)(1), 29 U.S.C. §§1002(21) and 1106(b)(1).

166. Defendant GE and/or the Investment Committee Defendants, and the Asset Management Defendants dealt with the assets of a plan in their own interest or for their own account by selecting and maintaining the GE Funds as the exclusive, actively management

investment options in the Plan despite their high fees and/or poor performance because GE received the financial benefit resulting from the performance of its wholly owned subsidiary and, upon information and belief, at least part the compensation of the individual Asset Management Defendants depended upon the performance of GE Asset Management.

167.  Defendant GE received consideration for its own account through the receipt of investment management fees paid to its wholly owned subsidiary and/or the profits derived from the fees generated by its wholly owned subsidiary in violation of ERISA §406(b)(3), 29 U.S.C. §1106(b)(3).   To the extent that the compensation of the individual Asset Management Defendants depended upon fees generated from Plan investments in GE Funds, the Asset Management Defendants received consideration for their own account in violation of ERISA §406(b)(3), 29 U.S.C. §1106(b)(3).

168.  As GE Asset Management was a subsidiary of GE until the sale to State Street, the individual Asset Management Defendants were all officers of GE Asset Management.   As a result, Defendant GE Asset Management would have known that Defendant GE and the Asset Management Defendants were dealing with the Plan in their own interest or for their own account by selecting and maintaining the GE Funds as options in the Plan or that these fiduciaries received consideration for their own account by selecting and maintaining the GE Funds as options in the Plan.

169.  By selecting the GE Funds as the options in the Plan and by maintaining these as the options in the Plan, Defendant GE, the Investment Committee Defendants and the Asset Management Defendants caused the plan to engage in a prohibited transaction in violation of ERISA §406(b)(1) and (3), 29 U.S.C. §1106(b)(1) and (3).

170.  As parties in interest, Defendant GE and GE Asset Management are liable for these violations of  ERISA §406(b)(1) and (3), 29 U.S.C. §1106(b)(1) and (3), pursuant to ERISA §502(a)(3).

171.  Pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), Defendants GE, the Asset Management Committee Defendants and GE Asset Management are liable to disgorge all amounts and profits received as a result of these prohibited transactions, and such other appropriate equitable relief as the Court deems proper.

## COUNT V

**Breach of Fiduciary Duties in Violation of ERISA §404(a)(1)(A), (B) and (D)
Against the Asset Management Defendants**

172.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

173.  Section 5(j) of the Trust Agreement provided a Plan fiduciary, namely the Asset Management Defendants, with the authority to direct Fidelity Management Trust Company ("Fidelity") to exercise its authority under Section 5(j)(v) and (vi).  Pursuant to Section 5(j)(v) of the Trust Agreement, Fidelity had the authority, power and responsibility to "settle, compromise, contest or submit to arbitration any claims, debts or damages due or owing to or from the Trust Fund, to commence or defend suits or legal proceedings and to represent the Trust Fund in suits or legal proceedings."  In addition, Section 5(j)(vi) of the Trust Agreement provided Fidelity with the authority, power and responsibility to "employ legal . . . and other assistance as may be required in carrying out the provisions of th[e] Trust Agreement."  As such, the Asset Management Defendants had a fiduciary duty to take action to remedy violations of breaches of fiduciary duty

174. In exercising their fiduciary duties under the Trust Agreement, the Asset Management Defendants were required to discharge their duties with respect to the Plan solely in

the interests of the participants and beneficiaries: (A) for the exclusive purpose of providing benefits to participants and their beneficiaries, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims, and (D) in accordance with the documents and instruments governing the plan, pursuant to ERISA §404(a)(1)(A), (B), and (D), 29 U.S.C. §1104(a)(1)(A), (B) and (D).

175.   At no time did the Asset Management Defendants take any action, including any legal action, or exercise another authority that they could have exercised under the Trust Agreement, the Plan Document, or ERISA to rectify the fiduciary breaches or prohibited transactions engaged in by the other fiduciaries or in the case of the Asset Management Defendants, themselves.

176.   Through these actions and omissions, the Asset Management Defendants failed to discharge their duties with respect to the Plan: (A) solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (B) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); and (D) in accordance with the documents and instruments governing the Plan in so far as those documents are consistent with ERISA.

177.   As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Class suffered substantial losses in the form of higher fees and/or lower returns on their

investments than they would have otherwise experienced.  Additionally, and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Asset Management Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits  made as a result of these Defendants' breaches of fiduciary duties.

**COUNT VI**

**Breaches of Fiduciary Duties of Prudence and Loyalty in Violation of ERISA §404(a)
Against the Board Defendants and the Investment Committee Defendants
for Failure to Monitor Other Fiduciaries**

178.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

179.  The Board Defendants were and continue to be fiduciaries of the Plan under ERISA §3(21) (A), 29 U.S.C. §1002(21) (A), because pursuant to the GE Pension Plan they were responsible for appointing and removing members of the BPIC and the Pension Board and for periodically monitoring their performance and to ensure they were performing their duties properly and in accordance with ERISA.

180.  The Investment Committee Defendants were and continue to be fiduciaries of the Plan under ERISA §3(21) (A), 29 U.S.C. §1002(21) (A), because, pursuant to the GE Pension Plan they were responsible for appointing and removing members of the GEAM Committee and the Defendant Fund Trustees, and for periodically monitoring their performance to ensure they were performing their duties properly and in accordance with ERISA.

181. As fiduciaries of the Plan, the Investment Committee Defendants and the Board Defendants were and continue to be required pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to

discharge their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Consistent with these duties, the Board Defendants and Investment Committee Defendants were required to ensure that the monitored fiduciaries were performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

182. To the extent the Investment Committee Defendants and the Board Defendants' delegated fiduciary monitoring responsibilities to other fiduciary Defendants, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were performed prudently and loyally.

183. The Investment Committee Defendants and the Board Defendants breached their fiduciary monitoring duties by, among other things:

(a)     failing to monitor and evaluate the performance of other fiduciary Defendants or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Defendants' election to load the Plan with actively managed affiliated proprietary mutual funds when superior non-proprietary investment alternatives were readily available elsewhere, as detailed herein;

(b)     failing to monitor the processes by which the Plan's investments were chosen, evaluated and retained, which would have alerted a prudent fiduciary to the preferential treatment Defendants gave to GE-affiliated funds out of self-interest, and not based on the best interest of the Plan's participants;

(c)     failing to monitor the process by which the Plan's investments were chosen, evaluated or retained, which would have alerted a prudent fiduciary of the excessive fees and/or underperformance of the GE Funds;

(d)     failing to monitor their appointees to ensure that they considered availability of comparable non-GE funds, including lower-cost funds with similar strategies and similar or superior performance and/or less expensive, better-performing Funds than the GE Funds; and

(e)     failing to remove fiduciaries whose performance was inadequate in that they continued to maintain costly and self-serving investments in the Plan, all to the detriment of the Plan and the Plan's participants' retirement savings, including Plaintiffs and members of the Class.

184.  As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs and members of the Class have suffered substantial losses in the form of higher fees and/or lower returns on their investments than they would have earned by the prudent and loyal investment of Plan assets.

185.  Pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), Defendants are liable to disgorge all fees received from the Plan directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breaches of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## COUNT VII

### Co-fiduciary Liability Under ERISA §405
### Against GE, the Board Defendants, the Pension Board Defendants, the
### Investment Committee Defendants, the Asset Management Defendants
### and the Fund Trustee Defendants

186.  Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

187.  ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability, which he may have had under any other provision of ERISA, if:

(1)      he participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2)      by his failure to comply with ERISA §404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)      he knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

188.  The Asset Management Defendants, the Fund Trustee Defendants, the Investment Committee Defendants, the Pension Board Defendants, the Board Defendants and Defendant GE were all fiduciaries of the Plan within the meaning of ERISA §402(a), 29 U.S.C. §1102(a), ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), or both.

189.  Each of the members of the Board, the GEAM Committee, the BPIC, and the GEPB knew of each breach of fiduciary duty by the other members of their respective Committee alleged herein arising out of the imprudent investment of the assets of the Plan in the GE Funds and the associated breaches.  Yet, they knowingly participated in fiduciary breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

190.  As some if not all of the members of the Board, the BPIC, the GEAM Committee, the GEPB and the Fund Trustees, were employees, officers or directors of Defendant GE, their knowledge is imputed to GE.  Defendant GE knew of the breach of fiduciary duty by each of them arising out of the imprudent investment of the assets of the Plan in the GE Funds and the associated breaches and GE had knowledge of its own fiduciary breaches in which these other fiduciaries participated.  Yet, Defendant GE knowingly participated in fiduciary breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

## COUNT VIII

### Knowing Participation in a Fiduciary Breach or
### Violation of ERISA Pursuant to ERISA 502(a)(3)
### Against Defendant GE and Defendant GE Asset Management

191.  Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

192.  ERISA §502(a)(3), 29 U.S.C. §1132(a)(3) imposes liability not only on fiduciaries of the Plan but also on non-fiduciaries of the Plan who knowingly participate in fiduciary breaches or other violations of ERISA or the terms of the Plan.  As such, GE Asset Management and Defendant GE (even if it is not a fiduciary), can be held liable if either of them knowingly participated in the fiduciary breaches or violations of any fiduciary of the Plan.

193.  Defendant GE Asset Management and Defendant GE would have known that each of the other Defendants were fiduciaries of the Plan as these other Defendants either were GE executives (or GE Asset Management executives) or were appointed by GE (or high level GE executives or GE Asset Management executives).  The knowledge of any such executives would be imputed to GE and/or GE Asset Management.

- 67 -

194.  Defendants GE and GE Asset Management would have been aware of the foregoing breaches and prohibited transactions, including:

(a)      the GE Funds had inferior investment performance;

(b)      the GE Funds charged excessive fees;

(c)      the fiduciaries who selected the GE Funds had conflicts of interest;

(d)      the selection and continued offering of the proprietary GE Funds was not in the best interests of the participants, but instead the primary purpose of offering the GE Funds as an investment option was to increase the assets under management, to increase the fees charged and the profits of GE Asset Management and to prime GE Asset Management for sale; and

(e)      the payment of these fees to GE Asset Management was a prohibited transaction.

195.  Despite knowledge of these breaches and violations, Defendants GE and GE Asset Management proceeded to engage in the transactions and receive fees.

196.  By knowingly participating in these breaches and violations, Defendants GE and/or GE Asset Management are subject to appropriate equitable relief including disgorgement of any profits, having a constructive trust placed on any proceeds received (or which are traceable thereto) including proceeds from the sale of GE Asset Management, or is subject to other appropriate equitable relief.

## ENTITLEMENT TO RELIEF

197.  By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled to sue each of the fiduciary Defendants pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plan as provided in ERISA §409, 29 U.S.C. §1109, including for recovery of any losses to the Plan, the recovery of any profits

resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

198.  By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring that each of the Defendants who are fiduciaries of the Plan have breached their fiduciary duties under ERISA;

B.     Ordering each fiduciary found to have breached his/her/its fiduciary duties to the Plan to jointly and severally restore all losses to the Plan that resulted from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA §405;

C.     Entering an order requiring (a) the disgorgement of profit made by any Defendant, (b) declaring a constructive trust over any assets received by any breaching fiduciary in connection with his/her/its breach of fiduciary duties, or violations of ERISA, or any non-fiduciary Defendant who knowingly participated in that breach or violation, (c)  requiring the Plan to divest itself of investments in the GE Funds and (d) any other appropriate equitable monetary relief, whichever is in the best interest of the Plan;

D.     Ordering, pursuant to ERISA §206(d)(4), 29 U.S.C. §1056(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plan;

E.     Removing any breaching fiduciaries as fiduciaries of the Plan and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiffs or any member of the Class is a participant or beneficiary;

F.      Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plan and the management of the Plan's investments and/or selection of investment options and/or to oversee the divestment of the Plan's investments;

G.      Ordering the Plan's fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plan;

H.      Awarding Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

I.      Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest;

J.      Awarding such equitable, injunctive or other relief as the Court may deem appropriate pursuant to ERISA §502(a)(3) or any relief to which Plaintiffs and the Class are entitled to pursuant to Fed. R. Civ. P. Rule 54(c); and

K.      Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

DATED: January 12, 2018                          */s/ Jason M. Leviton*
                                                 Jason M. Leviton
                                                 BLOCK & LEVITON LLP
                                                 155 Federal Street, Suite 400
                                                 Boston, MA  02110
                                                 Tel: (617) 398-5600
                                                 Fax: (617) 507-6020
                                                 Jason@blockesq.com

R. Joseph Barton (*pro hac vice*)
BLOCK & LEVITON LLP
1735 20th Street NW
Washington, DC  20009
Tel: (202) 734-7046
Fax: (617) 507-6020
Jbarton@blockesq.com

*Interim Liaison Counsel for Plaintiffs*

Evan J. Kaufman (*pro hac vice*)
Jordan D. Mamorsky
ROBBINS GELLER RUDMAN
   & DOWD LLP
58 South Service Road, Ste. 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173
ekaufman@rgrdlaw.com
jmamorsky@rgrdlaw.com

Mark C. Gardy
Orin Kurtz (*pro hac vice*)
GARDY & NOTIS, LLP
Tower 56
126 East 56th Street
New York, NY  10022
Tel: (212) 905-0509
Fax: (212) 905-0508
mgardy@gardylaw.com
okurtz@gardylaw.com

Lee Squitieri
SQUITIERI & FEARON, LLP
32 East 57th Street
12th Floor
New York, NY  10022
Tel: (212) 421-6492
Fax: (212) 421-6553
lee@sfclasslaw.com

*Interim Co-Lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Jason M. Leviton, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on January 12, 2018.

Dated: January 12, 2018                             /s/  *Jason M. Leviton*
                                                    Jason M. Leviton